# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Submitted December 1, 2011          Decided May 4, 2012

No. 10-3059

UNITED STATES OF AMERICA,
APPELLEE

v.

NANCY CONDE RUBIO,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cr-00248-2)

*Anthony D. Martin*, appointed by the court, was on the brief for appellant.

*Ronald C. Machen Jr.*, U.S. Attorney, and *Roy W. McLeese III, John P. Mannarino*, *Anthony Asuncion*, and *Michelle P. Brown*, Assistant U.S. Attorneys, were on the brief for appellee.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: Appellant Nancy Conde Rubio pled guilty to conspiracy to provide material support to a foreign

terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). She now asks that we vacate her sentence and remand the case for a new arraignment. Finding no error in the district court's acceptance of her plea, we affirm the judgment of conviction.[1]

I

Rubio was a member of the Fuerzas Armadas Revolucionarias de Colombia (FARC), a Colombian guerrilla organization that the State Department has designated as a foreign terrorist organization pursuant to 8 U.S.C. § 1189. The FARC regards American citizens as military targets, and has murdered and taken them hostage in Colombia. Statement of Facts at 1-2 (J.A. 71-72).[2]

Rubio was involved with the FARC's "1st Front," which operated in the rural and jungle states of Meta, Guaviare, and Vaupes. The 1st Front distributed cocaine to narcotics traffickers in exchange for money, weapons, and equipment. *Id.* at 2. Rubio -- at one point the fourth-ranking member of the 1st Front -- was responsible for the logistical and material supply network. *Id*. at 4. One critical piece of that network was the communications system she put in place, since there was no telephone service in the remote areas where the 1st Front operated. *Id*. at 3. Less than a year after Rubio physically left the 1st Front -- but while she was still providing assistance with the communications network -- the Front took three Americans

---

[1]This case was considered on the record from the United States District Court for the District of Columbia and on the briefs filed by the parties. *See* FED. R. APP. P. 34(a)(2); D.C. CIR. R. 34(j).

[2]The Statement of Facts was offered by the government to support the factual basis for the guilty plea. Statement of Facts at 8. Rubio signed the statement, acknowledging its truthfulness. *Id*. at 9.

hostage and held them for two years until they were rescued by the Colombian military. Gov't Mem. in Aid of Sentencing at 3 (J.A. 17). According to the government, the network put in place by Rubio enabled the FARC to maintain custody of the hostages. *Id*.

On September 25, 2007, a federal grand jury in the District of Columbia returned a three-count indictment against Rubio and several others. Rubio was charged in two of the three counts. Count 1 charged her (and others) with conspiracy to provide material support to a designated foreign terrorist organization, while Count 2 charged her (and others) with the substantive offense of providing material support, both in violation of 18 U.S.C. § 2339B(a)(1). Indictment at 2-21 (Supp. App. Tab 1 at 2-21). The third count, in which Rubio was not named, charged the defendants with hostage taking, in violation of 18 U.S.C. § 1203. *Id.* at 22-23. On January 31, 2008, the Colombian military arrested Rubio in the city of Cucuta, pursuant to a provisional arrest warrant lodged by the United States with the Colombian government. She was extradited to the United States on September 19, 2009.

In March 2010, Rubio entered into a plea agreement with the United States Attorney's Office. Among other things, she agreed to enter a plea of guilty to Count 1 of the indictment, and the government agreed to dismiss Count 2. Plea Agreement ¶¶ 1, 11 (J.A. 80, 83). Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agreed that the appropriate sentencing range would be 132 to 144 months. *Id*. ¶ 7. That rule provides that a plea agreement may specify that the government will "agree that a specific sentence . . . is the appropriate disposition of the case." FED. R. CRIM. P. 11(c)(1)(C). "[S]uch a recommendation or request binds the court once the court accepts the plea agreement." *Id*.; *see United States v. Jones*, 642 F.3d 1151, 1154 n.1 (D.C. Cir.

2011). Rubio, whose native language is Spanish, was provided with both English and Spanish versions of the agreement. *See* J.A. 80, 86.

Accompanied by counsel and an interpreter, Rubio appeared in district court on March 17, 2010 to enter her guilty plea. In taking the plea, the court followed the dictates of Rule 11, asking questions to ensure (inter alia) that the defendant understood her rights, the consequences of waiving those rights, and the nature of the charge to which she was pleading. Tr. of Plea Hr'g at 3-7 (Mar. 17, 2010) (J.A. 94-98); *see* FED. R. CRIM. P. 11(b)(1). The court also ensured that there was a factual basis for the plea and that it was voluntary. Tr. of Plea Hr'g at 8-9, 11; *see* FED. R. CRIM. P. 11(b)(2), (3). Finally, the court explained that, because the plea was of the type specified in Rule 11(c)(1)(C), if the plea were accepted the court would "be bound by th[e] guideline range you've agreed to of 132 to 144 months in prison," and would "have to sentence you within that guideline range." Tr. of Plea Hr'g at 8; *see* FED. R. CRIM. P. 11(c)(1)(C), (4). After assuring itself that Rubio understood, the court accepted her plea. Thereafter, on June 15, 2010, the court sentenced Rubio to 138 months' imprisonment, the middle of the range upon which the parties had agreed. Tr. of Sentencing at 9 (June 15, 2010) (J.A. 118). On June 24, Rubio filed a notice of appeal, seeking to have her sentence vacated.

II

Rubio contends that her constitutional rights were violated because (1) she did not enter into her plea knowingly and intelligently, and (2) she did not receive Spanish translations of all the documents in the case. We address these contentions in order.

1. Rubio does not argue that, in taking her plea, the district court failed to comply with any of the requirements of Rule 11. Rather, she appears to contend that the plea was obtained in violation of due process. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969) (holding that, if a plea is not "voluntary and knowing, it has been obtained in violation of due process and is therefore void"); *see also Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005). Rubio acknowledges that she did not object to the validity of her plea on this or any other ground in the district court. Both she and the government believe that, as a consequence, her appeal can succeed only if she establishes plain error. Appellant Br. 2-3; Gov't Br. 9-10. We need not address the standard of review, however, because there was no error -- plain or otherwise -- in the proceedings in the district court. As we discuss below, there is no reason to accept Rubio's contention that she did not "knowingly and intelligently" plead guilty. Appellant Br. 10.

The core of this contention is that "she did not understand what was taking place at the time of the signing of the plea agreement or during the Court proceedings" because her first language is Spanish. Appellant Br. 12. The facts contradict this claim. The record contains a Spanish translation of the plea agreement that was given to Rubio, J.A. 86-91, and at the plea hearing her attorney informed the judge that:

> I hired an interpreter/investigator to assist me in this case, and we went through the English version of the plea agreement and the statement of facts. I then had it interpreted into Spanish, and then we went to [the jail], we reviewed it in Spanish with [Rubio], and so what she signed today is identical to what she has agreed to.

Tr. of Plea Hr'g at 9-10. Moreover, a Spanish-language interpreter was present at the plea and sentencing hearings and translated each hearing as it proceeded. *Id*. at 2; Tr. of Sentencing at 9. At the plea hearing, the court and counsel again went over the plea agreement with Rubio. Tr. of Plea Hr'g at 9-10. She told the court that she understood it, had no questions about it, and agreed to it. *Id*. at 11-12.

Rubio also maintains that she did not understand "her right to correct inaccuracies in the stipulation of facts" presented to the court. Appellant Br. 10. Again, the record contradicts her. The district judge conducted a careful colloquy on precisely this issue. He first asked Rubio whether it was her signature on the last page of the stipulation. Tr. of Plea Hr'g at 11. After she told him (through the interpreter) that it was, the judge next asked whether she had gone "over that carefully" with her attorney. *Id*. After she said that she had, the judge then asked whether the stipulation represented "what really happened," and whether she was "in fact, guilty of this offense." *Id*. The latter two questions plainly gave Rubio an opportunity to correct any inaccuracies. Instead, she answered "yes" to each. Her attorney then stated, "for the record," that he had "gone through the Statement of Facts with her," it "was interpreted into Spanish for her, and she reviewed it and we discussed those facts." *Id*. at 12.

Rubio further claims that, "right up to the time of sentencing," she thought she would receive "a significant departure from the [sentencing] guidelines" based on her cooperation. Appellant Br. 13. This claim is simply not credible. The plea agreement stated that both she and the government agreed "that the appropriate sentence for the offense . . . is: a sentencing range of 132 to 144 months." Plea Agreement ¶ 7. The Spanish translation of the agreement set out that range in boldface. J.A. 88. The agreement made clear that, because this was to be a Rule 11(c)(1)(C) plea, that disposition

would be included in the court's judgment if the court accepted the plea. Plea Agreement ¶ 7. And it expressly stated that "the Government is not obligated and does not intend to file any downward departure sentencing motion under Section 5K1.1 of the Sentencing Guidelines" for assistance to the authorities. *Id*. ¶ 9. Rubio signed an acknowledgment "that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in this plea agreement." *Id*. at 6.

At the plea hearing, the court was careful to tell Rubio: "Ordinarily I have authority to sentence you to something more severe or less severe than the guidelines, but in this case, because you have agreed upon a guidelines sentence with the government, *I will have to sentence you within that guideline range*." Tr. of Plea Hr'g at 8 (emphasis added). She said she understood. *Id*. Consistent with this understanding, at the sentencing hearing Rubio's counsel asked the court to sentence her to 132 months, the bottom of the agreed-upon range. Tr. of Sentencing at 8. The court then asked Rubio whether she had "anything you'd like to say." *Id*. at 9. Had she truly believed, "up to the time of sentencing," that she would receive a significant departure from that range, this would have been the time to disagree with her counsel's recommendation for a sentence within the range. Instead, she said that she had nothing more to say. *Id*. Thereafter, the court sentenced her to 138 months, the midpoint of the range to which she had agreed in the plea agreement. *Id*.

Finally, we note that Rubio told the court that she had had adequate time and opportunity to discuss the case with her attorney, and that she was satisfied with his representation. Tr. of Plea Hr'g at 3. Nor has she alleged ineffective assistance of trial counsel on appeal, where she is represented by a different attorney. Accordingly, under all of the circumstances, there is

simply no basis for concluding that Rubio's plea was not made knowingly and intelligently. *Cf. Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (holding, with respect to a habeas petition, that "a defendant who pleads guilty upon the advice of counsel 'may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel'" was not "'within the range of competence demanded of attorneys in criminal cases'" (quoting *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *McMann v. Richardson*, 397 U.S. 759, 771 (1970))).

2. Rubio's second contention is that "Equal Protection" and "Due Process" required the government to provide her with Spanish translations of "all charging documents, discovery [documents] and plea agreements," as well as of the "presentence report." Appellant Br. 14, 17. There is no doubt that this claim, which she also did not raise below, may be reviewed solely for plain error. *See United States v. Simpson*, 430 F.3d 1177, 1183 (D.C. Cir. 2005); FED. R. CRIM. P. 52(b). Once again, the standard of review makes no difference to our disposition.

This Circuit has held that a criminal defendant does not have a constitutional right to written translations into her native language of all court documents. *See United States v. Celis*, 608 F.3d 818, 840-41 (D.C. Cir. 2010); *see also United States v. Gonzales*, 339 F.3d 725, 729 (8th Cir. 2003). Rather, whether to order translations is entrusted to the district court's discretion, based on a consideration of whether the defendant needs them to understand the evidence and charges against her, and to assist in her own defense. *Celis*, 608 F.3d at 841. In this case, both the plea agreement and the agreed-upon statement of facts were translated into Spanish. The latter contained a seven-page "summary of the government's evidence in support of [the] defendant's guilty plea." Statement of Facts at 8. Rubio stated that she had discussed it with her attorney, "fully underst[oo]d"

it, "acknowledge[d] its truthfulness," and "accept[ed] it without reservation." *Id*. at 9. In addition, at the plea hearing the district court (through the interpreter) carefully went over the count of the indictment to which she was pleading guilty, Tr. of Plea Hr'g 5-7, which she said she understood, *id.* at 7.

Rubio never asked the district court for translations of any other documents, and even now does not specify any document that, if translated, would have affected her ability "to make a knowing and intelligent decision regarding the plea offer." Appellant Br. 18. Accordingly, we conclude that the district court did not abuse its discretion, let alone commit plain error, in failing to order *sua sponte* the translation of additional documents.

### III

For the foregoing reasons, the judgment of the district court is

*Affirmed.*